**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| LAURA NAVA, ) | |
| ) | |
| Plaintiff, ) | Case No. SACV 15-1755 AJW |
| ) | |
| v. ) | MEMORANDUM OF DECISION |
| ) | |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of the Social ) | |
| Security Administration, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

Plaintiff filed this action seeking reversal of the decision of defendant, the Commissioner of the Social Security Administration (the "Commissioner"), denying plaintiff's application for supplemental security income. The parties have filed a Joint Stipulation ("JS") setting forth their contentions with respect to each disputed issue.

**Administrative Proceedings**

The parties are familiar with the procedural facts, which are summarized in the Joint Stipulation. [See JS 2-4]. After an administrative hearing, an Administrative Law Judge ("ALJ") issued a written decision denying benefits. [AR 14-26]. The ALJ found that plaintiff had the following severe impairments: substance addiction disorder in remission and back strain. [AR 16]. The ALJ further found that plaintiff retained the residual functional capacity ("RFC") to "perform light work . . . except: [plaintiff] can lift and/or carry twenty pounds occasionally, ten pounds frequently; [plaintiff] can stand or walk for four hours

1  out of an eight-hour workday with normal breaks; [plaintiff] can sit for six hours out of an eight-hour
2  workday with normal breaks; [plaintiff] can perform complex tasks; [plaintiff] can perform work that
3  requires frequent changes in the work setting; [plaintiff] is limited to jobs with no more than normal and
4  ordinary pressures of common work; [and plaintiff] is restricted from highly stressful jobs, such as high
5  production quotas and dynamic teamwork." [AR 18]. Based on the testimony of a vocational expert ("VE"),
6  the ALJ determined that plaintiff could perform her past relevant work as an office manager. [AR 25].
7  Accordingly, the ALJ found that plaintiff was not disabled at any time from the date her SSI application was
8  filed through the date of the ALJ's decision. [AR 26].

## Standard of Review

The Commissioner's denial of benefits should be disturbed only if it is not supported by substantial evidence or is based on legal error. Brown-Hunter v. Colvin, 806 F.3d 487, 492 (9th Cir. 2015); Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002). "Substantial evidence" means "more than a mere scintilla, but less than a preponderance." Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1 (9th Cir. 2005). "It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (internal quotation marks omitted). The court is required to review the record as a whole and to consider evidence detracting from the decision as well as evidence supporting the decision. Robbins v. Soc. Sec. Admin, 466 F.3d 880, 882 (9th Cir. 2006); Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999). "Where the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld. Thomas v. Barnhart, 278 F.3d 947, 954 (9th Cir. 2002) (citing Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999)).

## Discussion

**Medical opinion evidence**

Plaintiff contends that the ALJ erred in evaluating the opinions of her psychiatric treating sources, J. Kellogg, M.D., and nurse practitioner Dana Lambrose. [JS 13].

A treating or examining physician's opinion is not binding on the Commissioner with respect to the existence of an impairment or the ultimate issue of disability. Tonapetyan v. Halter, 242 F.3d 1144, 1148 (9th Cir. 2001). Where, however, a treating physician's medical opinion as to the nature and severity of an

1  individual's impairment is well-supported and not inconsistent with other substantial evidence in the record,
2  that opinion is entitled to controlling weight. Edlund v. Massanari, 253 F.3d 1152, 1157 (9th Cir. 2001);
3  Holohan v. Massanari, 246 F.3d 1195, 1202 (9th Cir. 2001); see 20 C.F.R. §§ 404.1527(c)(2),
4  416.927(c)(2); Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *1-*2. Even when not entitled
5  to controlling weight, "treating source medical opinions are still entitled to deference and must be weighed"
6  in light of (1) the length of the treatment relationship; (2) the frequency of examination; (3) the nature and
7  extent of the treatment relationship; (4) the supportability of the diagnosis; (5) consistency with other
8  evidence in the record; and (6) the area of specialization. Edlund, 253 F.3d at 1157 & n.6 (quoting SSR 96-
9  2p and citing 20 C.F.R. § 404.1527); Holohan, 246 F.3d at 1202.

10  The ALJ must provide clear and convincing reasons, supported by substantial evidence in the record,
11  for rejecting an uncontroverted treating source opinion. If contradicted by that of another doctor, a treating
12  or examining source opinion may be rejected for specific and legitimate reasons that are based on substantial
13  evidence in the record. Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004);
14  Tonapetyan, 242 F.3d at 1148-1149; Lester v. Chater, 81 F.3d 821, 830-831 (9th Cir. 1995). "The opinion
15  of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of
16  the opinion of either an examining physician or a treating physician." Lester, 81 F.3d at 831.

17  The record in this case contains conflicting medical treating, examining, and nonexamining source
18  opinions. Accordingly, the ALJ was entitled to reject the treating and examining source opinions so long
19  as he articulated specific and legitimate reasons supported by substantial evidence for doing so.

20  In reaching his June 25, 2015 decision denying benefits, the ALJ considered treating and examining
21  source records from Progeny Psychiatric Group, where plaintiff began outpatient psychiatric treatment in
22  May 2014. [See AR 376-402]. Plaintiff was seen monthly for psychotherapy and medication management,
23  usually by nurse practitioner Dana Lambrose but occasionally by other clinicians who were not physicians.
24  None of those treatment reports indicate that plaintiff was seen by Dr. Kellogg or by another physician, nor
25  do Ms. Lambrose's reports contain any indication that a physician reviewed Ms. Lambrose's reports. [See
26  AR 376-398].

27  On June 1, 2015, Ms. Lambrose and Dr. Kellogg completed a mental medical source questionnaire
28  indicating that plaintiff is precluded from every rated ability and aptitude necessary for unskilled work for

1 15% or more of an eight-hour workday, including "carry[ing] out very short and simple instructions," and
2 "sustain[ing] an ordinary routine without special supervision." [AR 401]. They also indicated that plaintiff
3 would find all of the rated work demands "stressful," including "getting to work regularly," "making
4 decisions," "completing tasks," and dealing with supervisors and the public. [AR 402]. Ms. Lambrose and
5 Dr. Kellogg opined that plaintiff had a range of symptoms and disorders, including bipolar syndrome and
6 severe panic attacks. [AR 400].

7 The ALJ permissibly found that the questionnaire completed by Dr. Kellogg and Ms. Lambrose was
8 inconsistent with the treatment reports from Progeny Psychiatric Group as well as with the findings and
9 conclusions of the examining psychiatrist, Dr. Aguilar. For example, the questionnaire states that plaintiff's
10 highest Global Assessment of Function ("GAF") score in the past year was 45. [AR 400]. On May 27,
11 2014, however, Ms. Lambrose recorded plaintiff's GAF score as 75.[1] [AR 397]. See Morgan, 169 F.3d at
12 603 (holding that the ALJ permissibly rejected the treating and examining sources' opinions in favor of a
13 nonexamining source opinion based on inconsistencies within, and between, the treating and examining

---

[1] Under the fourth edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, a clinician's GAF score provides "a rough estimate of an individual's psychological, social, and occupational functioning used to reflect the individual's need for treatment." Garrison v. Colvin, 759 F.3d 995, 1003 n.4 (9th Cir. 2014) (quoting Vargas v. Lambert, 159 F.3d 1161, 1164 n. 2 (9th Cir.1998) and citing SSR 85-15); see Diagnostic and Statistical Manual of Mental Disorders, 31–34 (4th ed. rev. 2000) ("DSM-IV"). "[T]he fifth edition of the Diagnostic and Statistical Manual of Mental Disorders issued May 27, 2013, abandoned the GAF scale in favor of standardized assessments for symptom severity, diagnostic severity, and disability . . . . " Wilson v. Colvin, 72 F. Supp. 3d 1159, 1164 & n. 2 (D. Or. 2014) (citing Diagnostic and Statistical Manual of Mental Disorders, 16 (5th ed. 2013) ("DSM-V")); see Lees v. Colvin, 2014 WL 2896004, at *2 (W.D. Wash. June 25, 2014) ("The most recent version of the DSM does not include a GAF rating for assessment of mental disorders.") (citing DSM–V at 16-17). The Commissioner "continues to receive and consider GAF scores from acceptable medical sources as opinion evidence, [but] a GAF score cannot alone be used to raise or lower someone's level of function, and, unless the reasons behind the rating and the applicable time period are clearly explained, it does not provide a reliable longitudinal picture of the claimant's mental functioning for a disability analysis." Lees, 2014 WL 2896004, at *2 (internal quotation marks omitted).

Under the DSM-IV, a GAF score between 41 and 50 signifies serious symptoms or any serious impairment in social, occupational, or school functioning; s GAF score between 51 and 60 describes moderate symptoms or any moderate difficulty in social, occupational, or school functioning; and a GAF score between 71 and 80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors, representing no more than a slight impairment in social, occupational, or school functioning. See Garrison, 759 F.3d at 1003 n. 4; DSM-IV at 31-34.

4

source reports). Additionally, the treating source reports provide little objective or clinical support for the conclusions expressed by Ms. Lambrose and Dr. Kellogg. See Bayliss, 427 F.3d at 1217 (noting that "an ALJ need not accept the opinion of a doctor if that opinion is brief, conclusory, and inadequately supported by clinical findings," and holding that the ALJ properly rejected a treating physician's opinion in part because it was contradicted by the doctor's treatment notes); Connett v. Barnhart, 340 F.3d 871, 874-875 (9th Cir. 2003) (holding that the ALJ did not err in rejecting the controverted opinion of a treating physician whose restrictive functional assessment was not supported by his treatment notes). Ms. Lambrose's treatment notes briefly record her observations and plaintiff's statements, and in general tend to show some variation in plaintiff's well-being related to her medication compliance and admitted use of illicit substances. For example, in July 2014, Ms. Lambrose recorded that plaintiff's mood was "euthymic," and her behavior was "cooperative and calm," noting "significant improvement" and an effective regimen of medication. [AR 390]. Yet in August 2014, Ms. Lambrose observed that plaintiff's mood was "labile" and her behavior was "restless," and plaintiff reported that she was "checking into a detox this evening – methamphetamine addiction." [AR 387]. In September 2014, plaintiff said that she was six weeks sober and was going to the gym every day. [AR 387]. In October 2014, plaintiff told Ms. Lambrose "I have my brain back again. I can think and get things done." [AR 381]. In November 2014, Ms. Lambrose found that plaintiff was "happy" and "cooperative," showed "significant improvement," and was "sleeping well." [AR 380]. On December 8, 2014, however, plaintiff called the clinic saying that she looked and felt like a "wreck" and could not attend her appointment. Ms. Lambrose instructed her to go to the emergency room for evaluation. [AR 379]. A report from December 29, 2014 noted that plaintiff was "happy" and "stable," and that her medications "are effective per expectations." Plaintiff disclosed that she was planning on "entering rehab in one month . . . ." [AR 377]. In February 2015, plaintiff was noted to be "non-adherent" with medications prescribed for schizophrenia and insomnia (Saphris and Trazodone); she reported that she was not experiencing psychosis or insomnia and "no longer wishes to take them." [AR 376]. Plaintiff exhibited "good response" to her other prescribed medications, Wellbutrin, Prozac, Vitamin B12, and Adderall, which were prescribed "to control[] PTSD symptoms, depression, and inattentiveness." [AR 376].

The ALJ permissibly determined that Dr. Kellogg and Ms. Lambrose's questionnaire is "inadequately supported by clinical findings" and that the treating source reports "document[ed]

significantly improved symptoms during periods of medication compliance and abstinence from illegal substances," undermining the conclusions expressed in their questionnaire. [AR 24].

The ALJ also relied on the June 2014 opinion of the consultative psychiatric examiner, Norma R. Aguilar, M.D., who interviewed plaintiff and conducted a mental status examination. Plaintiff reported that she had abused prescription narcotics until a month earlier and had started psychiatric treatment at about the same time, with a "fair response" to prescribed medication and weekly psychotherapy sessions. [AR 278]. Dr. Aguilar found that plaintiff was "cooperative" with normal speech, a "slightly depressed" mood and a "slightly constricted" affect, without delusions or hallucinations, with grossly normal memory, concentration, information fund and judgment. [AR 279-280]. Dr. Aguilar diagnosed PTSD and "Alcohol and Other Substance Abuse, in partial remission." [AR 280]. She opined that plaintiff was moderately limited in her ability to respond to work pressure and mildly limited in her ability to respond to changes in a routine work setting and daily living, but had no limitation following simple or detailed job instructions, interacting with others, or complying with job rules. [AR 280-281]. Dr. Aguilar gave plaintiff a GAF score of 55-60, denoting moderate symptoms or moderate or any moderate difficulty in social, occupational, or school functioning. [AR 22]. Dr. Aguilar opined that plaintiff's "prognosis is poor at present but fair with stabilization and abstinence from drugs." [AR 281]. The ALJ concluded that Dr. Aguilar's report was consistent with the evidence as a whole and gave it "great weight." [AR 24].

Additionally, the ALJ gave some weight to the July 2014 opinion of a nonexamining state agency psychologist who concluded that plaintiff was only mildly impaired in activities of daily living, social functioning, and maintaining concentration, persistence or pace, and that she did not have any severe mental impairment. [AR 24, 79].

The ALJ's evaluation of the medical evidence is supported by substantial evidence in the record. The ALJ assessed plaintiff's medical records as a whole, including treating source notes concerning plaintiff's therapy sessions, medications, and response to treatment, as well as the reports of the Commissioner's consultative examining and nonexamining sources. The ALJ did not err in giving little weight to the questionnaire signed by Ms. Lambrose and Dr. Kellogg.

**Credibility finding**

Plaintiff contends that the ALJ failed to articulate legally sufficient reasons for rejecting her

testimony regarding her subjective symptoms. [JS 21-24].

If the record contains objective evidence of an underlying physical or mental impairment that is reasonably likely to be the source of a claimant's subjective symptoms, the ALJ is required to consider all subjective testimony as to the severity of the symptoms. Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004); Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991) (en banc); see also 20 C.F.R. §§ 404.1529(a), 416.929(a) (explaining how pain and other symptoms are evaluated). Absent affirmative evidence of malingering, the ALJ must then provide specific, clear and convincing reasons for rejecting a claimant's subjective complaints. Vasquez v. Astrue, 547 F.3d 1101, 1105 (9th Cir. 2008); Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1160-1161 (9th Cir. 2008); Moisa, 367 F.3d at 885. "In reaching a credibility determination, an ALJ may weigh inconsistencies between the claimant's testimony and his or her conduct, daily activities, and work record, among other factors." Bray v. Comm'r of Social Sec. Admin., 554 F.3d 1219, 1221, 1227 (9th Cir. 2009); Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir.1997). The ALJ's credibility findings "must be sufficiently specific to allow a reviewing court to conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit the claimant's testimony." Moisa, 367 F.3d at 885. If the ALJ's interpretation of the claimant's testimony is reasonable and is supported by substantial evidence, it is not the court's role to "second-guess" it. Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).

At the administrative hearing, plaintiff testified that she is unable to work due to anxiety, PTSD, guilt, shame, physical pain, depression, night terrors and panic attacks. [AR 43-45]. According to plaintiff, she has crying spells when she realizes she does not fit in with the mainstream world. [AR 45]. She reported difficulty concentrating and initiating tasks, and she described her behavior as erratic. [AR 41, 46]. She says she has anxiety attacks that "used to last for weeks or months." [AR 48]. The medications that she takes for her psychiatric conditions make her feel sleepy, and she has to take a nap every day. [AR 50]. She testified that she cannot get out of bed due to pain, and wears a diaper at night. [AR 45]. She further testified that she has a history of illegal drug use, and that she once went a period of six months without using illegal drugs. [AR 50-51]. She testified that she experienced anxiety when she was not using drugs. [AR 51].

The ALJ found that plaintiff had severe impairments consisting of back strain and alcohol and drug dependence in remission, but that plaintiff's allegations as to the intensity, duration and functionally limiting

effects of those impairments were not fully credible. [AR 20-24]. The ALJ gave legally sufficient reasons for rejecting plaintiff's credibility.

First, the ALJ rejected plaintiff's credibility because "the objective medical evidence does not support the alleged severity of symptoms." [AR 24]. "Although lack of medical evidence cannot form the sole basis of discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis." Burch, 400 F.3d at 681; Rollins, 261 F.3d at 857 (noting that "[w]hile subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disability effects"). No physician testified that plaintiff is as physically limited as she maintains, or that she is disabled by her pain or anxiety . Rather, John Sedgh, M.D., a board-certified internist, examined plaintiff and reported that her cervical spine, lumber spine, shoulders, elbows, wrists, hands, hips, ankles, motor strength, sensation, reflexes, cranial nerves, and gait were all within normal limits. [AR 266-269]. See Parra v. Astrue, 481 F.3d 742, 750 (9th Cir. 2007) (holding that the ALJ permissibly discounted the claimant's complaints of bursitis-related knee pain based on laboratory tests showing knee function within normal limits). Dr. Sedgh opined that plaintiff "can lift and carry 50 pounds occasionally and 25 pounds frequently. She can stand and walk six hours in an eight-hour day with normal breaks. She can sit for six hours in an eight-hour day. Kneeling, crouching and stooping should be limited to frequent. She can reach above shoulder level and perform fine and gross manipulation without limitations." [AR 269].

Moreover, as noted above, the ALJ permissibly determined that the treating source objective and clinical findings were inconsistent with the existence of a disabling mental disorder and instead indicated that plaintiff responded well to treatment when she was compliant with her medications and abstained from illegal substance abuse. [See AR 22-24]. The ALJ properly relied on the lack of corroborating medical evidence as a factor in his credibility assessment. See, e.g., Stubbs-Danielson v. Astrue, 539 F.3d 1169, 1175 (9th Cir. 2008) (noting that the medical evidence, including medical reports which found that the claimant could perform a limited range of work, supported the ALJ's credibility determination).

Next, the ALJ noted that plaintiff "has not generally received the type of medical treatment one would expect for a totally disabled individual." [AR 20]. "[A] conservative course of treatment can undermine allegations of debilitating pain." Carmickle, 533 F.3d at 1162; Orn v. Astrue, 495 F.3d 625, 638

(9th Cir. 2007). Plaintiff alleged that she was unable to get out of bed due to pain. [AR 18]. Aside from a May 2015 spinal health evaluation recommending a back brace that "immediately reduced [plaintiff's] low back pain to minimal levels" [AR 399], the record contains little evidence that plaintiff complained of or sought treatment for such pain in recent years. The ALJ permissibly discounted plaintiff's subjective pain complaints based on her history of conservative treatment. See Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (holding that the ALJ permissibly inferred that the claimant's "pain was not as all-disabling as he reported in light of the fact that he did not seek an aggressive treatment program" and "responded favorably to conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset") (citing Parra, 481 F.3d at 750–751 (stating that "evidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment"); Orn v. Astrue, 495 F.3d 625, 638 (9th Cir. 2007) ("Our case law is clear that if a claimant complains about disabling pain but . . . fails to follow prescribed treatment[] for the pain, an ALJ may use such failure as a basis for finding the complaint unjustified or exaggerated."); Warre v. Comm'r of the Soc. Sec. Admin., 439 F.3d 1001, 1006 (9th Cir. 2005) ("Impairments that can be controlled effectively with medication are not disabling."); Osenbrock v. Apfel, 240 F.3d 1157, 1166 (9th Cir. 2001) (holding that the ALJ properly rejected the claimant's testimony because he did not use "Codeine or Morphine based analgesics that are commonly prescribed for severe and unremitting pain").

Finally, the ALJ summarized plaintiff's testimony and written statements regarding her daily activities. [See AR 18-20]. Although plaintiff reported that her ability to carry out daily activities varied, she reported that at time she was able to care for pets, prepare occasional meals, perform personal grooming activities (but sometimes needed reminders), do laundry at the laundromat (where she said that she sometimes had panic attacks), spend time with her boyfriend or others on a one-on-one basis, occasionally attend church, and spend time reading. [See AR 18-20, 47-50, 176-183, 204-212]. The ALJ determined that plaintiff's "ability to participate in such activities [of daily living] undermined the credibility of [her] allegations of disabling functional limitations." [AR 20].

The Ninth Circuit has "repeatedly warned that ALJs must be especially cautious in concluding that daily activities are inconsistent with testimony about pain, because impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more

than merely resting in bed all day," and it has held that an ALJ erred in concluding that a claimant's daily activities that "included talking on the phone, preparing meals, cleaning her room, and helping to care for her daughter" were inconsistent with the claimant's pain complaints. Garrison v. Colvin, 759 F.3d 995, 1015-1016 (9th Cir. 2014); see Molina v. Astrue, 674 F.3d 1104, 1112-1113 (9th Cir. 2012) (stating that an ALJ may consider "whether the claimant engages in daily activities inconsistent with the alleged symptoms" and whether "the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting," and noting that "[e]ven where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment"). The ALJ erred in relying on plaintiff's reported daily activities because those activities were not inconsistent with her subjective complaints, did not suggest that she was capable of meeting the demands of a work on a sustained basis, and did not indicate capabilities that are transferrable to a work setting. See Garrison, 759 F.3d at 1015-1016; Molina, 674 F.3d at 1112-1113.

Where, as here, an ALJ provides legally sufficient reasons supporting his credibility determination, the ALJ's reliance on erroneous reasons is harmless "[s]o long as there remains substantial evidence supporting the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's ultimate credibility conclusion . . . ." Carmickle, 533 F.3d at 1162 (internal quotation marks, ellipsis, and alteration omitted); see generally McLeod v. Astrue, 640 F.3d 881, 886-888 (9th Cir. 2011) (holding that the harmless error rule ordinarily applied in civil cases applies in social security disability cases, and that the burden is on the party attacking the agency's determination to show that prejudice resulted from the error) (citing Shinseki v. Sanders, 556 U.S. 396, 406-409 (2009)). Since the ALJ articulated two other legally sufficient reasons supporting his adverse credibility finding, his reliance on plaintiff's daily activities was harmless.

**Past relevant work finding**

Plaintiff argues that the ALJ erred at step four in determining that she could perform her past relevant work as an office manager. [See AR 25]. Specifically, plaintiff contends that the requirements of that job as set forth in the Dictionary of Occupational Titles ("DOT") are inconsistent with her RFC. [JS 4-7]. Among several other limitations, plaintiff's RFC restricts her "from highly stressful jobs, such as high production quotas and dynamic teamwork." [AR 18].

A social security disability claimant bears the burden of proving that she cannot perform either the "actual functional demands and job duties of a particular past relevant job" or the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." Pinto v. Massanari, 249 F.3d 840, 845 (9th Cir. 2001) (quoting SSR 82-62); see also Burch, 400 F.3d at 679; Villa v. Heckler, 797 F.2d 794, 798 (9th Cir. 1986). The ALJ's obligation is "to make the requisite factual findings to support" the conclusion that the claimant can perform past relevant work. "This is done by looking at the residual functional capacity and the physical and mental demands of the claimant's past work." Pinto, 249 F.3d at 844-845 (quoting 20 C.F.R. §§ 404.1520(e) and 416.920(e)). Because the claimant bears the burden of proving her inability to perform past relevant work, the ALJ is not required to elicit or rely on VE testimony in order to support a finding of non-disability at step four. Where, however, the ALJ's step-four finding rests on a determination that the claimant can perform her past relevant work "as generally performed," rather than as actually performed in a particular past job, the DOT or VE must be consulted to determine the "functional demands and job duties of the occupation as generally required by employers throughout the national economy." Pinto, 249 F.3d at 845-846; see SSR 00-4p, 2000 WL 1898704, *2 ("In making disability determinations, we rely primarily on the DOT (including its companion publication, the SCO) for information about the requirements of work in the national economy. We use these publications at steps 4 and 5 of the sequential evaluation process. We may also use VEs and VSs at these steps to resolve complex vocational issues.") (footnote omitted). If the ALJ wishes to rely on a VE's testimony, the VE "merely has to find that a claimant can or cannot continue his or her past relevant work as defined by the regulations . . . ." Pinto, 249 F.3d at 845. Even with such VE testimony, however, the ALJ is not "in any way relieved of his burden to make the appropriate findings to insure that the claimant really can perform his or her past relevant work." Pinto, 249 F.3d at 845.

An ALJ may not rely on a VE's testimony regarding the requirements of a job as generally performed at either step four or step five without first determining whether that testimony conflicts with the DOT. See Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007); Pinto, 249 F.3d at 845-846. If an apparent or obvious conflict exists, the ALJ may not rely on the VE's testimony without asking the VE to explain the conflict and then determining whether the VE's explanation for the conflict is reasonable. Gutierrez v. Colvin, 844 F. 3d 804, 807 (9th Cir. 2016); Zavalin v. Colvin, 778 F.3d 842, 846 (9th Cir.

2015); Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007); SSR 00-4p, 2000 WL 1898704, at *2-*4. An "obvious or apparent" conflict "means that the [VE's] testimony must be at odds with the [DOT] listing of job requirements that are essential, integral, or expected." Gutierrez, 844 F. 3d at 808. If no obvious or apparent conflict exists between the specific skills identified by the DOT and the VE's testimony, the ALJ need not inquire further. Gutierrez, 844 F.3d at 807-808 (rejecting the argument that the ALJ erred at step five by not asking the VE more specific questions about the claimant's ability to perform a job because there was no obvious or apparent conflict); see also Edwards v. Astrue, 2013 WL 1891764 at *6 (N.D. Cal. May 6, 2013) ("Error in failing to follow [SSR] 00-4p is harmless only if 1) there was no conflict; or 2) the VE provided sufficient support for his conclusion to justify any potential conflicts.") (citing Massachi, 486 F.3d at 1154 n. 19).

At the administrative hearing, the ALJ presented a hypothetical question to the VE as to whether there are jobs in significant numbers in the economy for someone with plaintiff's various physical and mental limitations, given her age, education and work history. The VE testified that someone with those limitations could perform plaintiff's past work as an office manager. The VE classified that work as sedentary, skilled work as generally performed pursuant to the DOT, and as sedentary, semiskilled work as described by and actually performed by plaintiff. [See AR 25, 55, 227]. The ALJ determined that the VE's testimony was consistent with the DOT and accepted it, finding that plaintiff retained the ability to perform her past relevant work as an office manager both as actually and generally performed. [AR 25].

The DOT describes the duties of an office manager as follows:

> Coordinates activities of clerical personnel in establishment or organization: Analyzes and organizes operations and procedures, such as typing, bookkeeping, preparation of payrolls, flow of correspondence, filing, requisition of supplies, and other clerical services. Evaluates office production, revises procedures, or devises new forms to improve efficiency of workflow. Establishes uniform correspondence procedures and style practices. Formulates procedures for systematic retention, protection, retrieval, transfer, and disposal of records. Plans office layouts and initiates cost reduction programs. Reviews clerical and personnel records to ensure completeness, accuracy and timeliness. Prepares activities reports for guidance of management using computer. Prepares employee ratings and conducts employee

benefit and insurance programs, using computer. Coordinates activities of various clerical departments or workers within department. May prepare organizational budget and monthly finance reports. May hire, train and supervise clerical staff. May compile, store, and retrieve managerial data, using computer.

DOT job no. 169.167-034, *available at* 1991 WL 647430.

Plaintiff contends that her RFC limitation against dynamic teamwork precludes her from performing her past relevant work as an office manager as generally performed according to the DOT that job would require her "to work and coordinate with other team members" and necessarily would entail "performing a variety of duties, dealing with people, and making judgments and decisions . . . that can easily be described as 'dynamic.'" [JS 7, 11].

Plaintiff's contention lacks merit. There is no apparent or obvious conflict between plaintiff's RFC and the DOT description of the job of office manager. The RFC states that plaintiff "is restricted from highly stressful jobs, such as high production quotas and dynamic teamwork." [AR 18]. During the administrative hearing, the ALJ asked the VE whether plaintiff could perform her past work, considering a limitation against "any highly stressful jobs, *such as* high production quotas, teamwork, dynamic teamwork where members of the team have to depend upon each other." [AR 54 (italics added)]. The VE considered the limitation and identified the office manager job as a job plaintiff could perform. [AR 55]. In context, it is clear that the ALJ placed a limitation on plaintiff's ability to do a "highly stressful" job, not a blanket restriction on all jobs that require various duties and interaction with other people, as plaintiff contends. A limitation against "dynamic teamwork" does not preclude plaintiff from all occupations requiring interactions with others, nor does it preclude plaintiff from all occupations requiring teamwork.

Further, the DOT description of office manager does not indicate that it is a highly stressful job that requires dynamic teamwork as an "essential, integral, or expected" job duty. Gutierrez, 844 F. 3d at 808 Plaintiff offers no support for her conclusory assertion that working and coordinating with other team members is necessarily dynamic teamwork. See, e.g., Luster v. Colvin, 2013 WL 4479090, at *5 (C.D. Cal. Aug. 19, 2013) (holding that plaintiff's "unsupported assertions do not establish that there is any conflict" between the DOT description of the job of counter clerk "and the VE's testimony that an individual precluded from fast-paced work and hypervigilance can perform the job of counter clerk."); Jones v. Colvin,

2015 WL 1266789, *6 (C.D. Cal. Mar. 18, 2015) ("Plaintiff cites no legal authority for her contention that the ALJ should not have relied on [the VE and the DOT], and the Court is aware of no legal authority that permits an ALJ to reject VE testimony and the DOT whenever he feels it conflicts with 'common sense' and his own personal experience.").

Since plaintiff fails to demonstrate an "obvious or apparent" conflict, the ALJ had no duty to inquire further of the VE and did not err in relying on the VE's testimony to find that plaintiff could perform her past relevant work as an office manager as generally performed according to the DOT. Even if the ALJ erred in that respect, moreover, any error is harmless because plaintiff has not argued or shown that the RFC assigned by the ALJ precluded her from performing her past relevant work as an office manager as she actually performed that job. See Villa, 797 F.2d at 798 (stating that at step four, "[t]he claimant has the burden of proving an inability to return to his former type of work and . . . to his former job").

**Conclusion**

For the reasons stated above, the Commissioner's decision is supported by substantial evidence and is free of reversible legal error. Accordingly, the Commissioner's decision is **affirmed**.

**IT IS SO ORDERED.**

February 21, 2017

_____
ANDREW J. WISTRICH
United States Magistrate Judge